Good morning. When your case is called, please approach the podium, tell us your name and whom you represent. It's a recording device, so not an amplifier, so keep your voice down. We've read your material, so I encourage you to get to your most important argument first. We'll give you 15 minutes for each side. The appellant should save a few minutes for rebuttal. We're not strict clock watchers, but if you're going on too long, I'll ask you to wrap up. Please call the first case. 1427-79, Reginald Malone Good morning, Your Honors. Aliza Kaliske, Office of the State Appellate Defender for Reginald Malone. Good morning, Counsel. Good morning, Your Honors. Harina Megani-Wakely, representing the people of the State of Illinois. Good morning, Counsel. Whenever you're ready, Counsel. First, I'd like to reserve approximately five minutes for my rebuttal. Good morning, Your Honors, and may it please the Court. From the beginning of the State's case, through the chemist's testing, every aspect of this case is so deficient that it is impossible to reasonably accept that the State met its burden to prove Reginald Malone guilty beyond a reasonable doubt. The case began with Officer Grubbs' testimony that she bought two bags of heroin from Malone with $20 in pre-recorded funds. He is arrested approximately three minutes after the transaction with no drugs and no pre-recorded funds in his possession, but he's got $73.30 of his own money. Given how quickly he was arrested after the transaction, you would expect him to have the pre-recorded funds. And the State, the lawyer, tried to argue that the money was in the alley with the drugs, but again, he had his own money when he was arrested, and it doesn't make any sense that he would know to dispose of just this $20 in pre-recorded funds. The entire purpose of pre-recorded funds is for them to be unobtrusive. Otherwise, obviously, you'd realize you were getting marked money. And reasonable police procedure would have been to search the alley when he's arrested and he's not found with any drugs or money because he's coming out of the alley as he's arrested. We have a team here of five officers, at least five officers, who if you believe the officer's testimony, that's where he came from. You would expect that, you know, somebody on that team of five officers would go in, search the alley. So really the only reasonable inference is that the alley was searched and that nothing was found. But do we know that for sure, or are you inferring that? It is an inference from the record based on the fact that this is a narcotics team whose job is to get drugs off the streets with five officers. This is not a case with a single officer who's holding on to the defendant while waiting for backup to arrive. We have enough officers there that somebody would have searched that alley, given otherwise it leads to the conclusion that the police are leaving what they believe to be drugs on the streets, and narcotics police. And that just doesn't stand for the mission of these police officers. Counsel, would we have to find Officer Grubbs' testimony? Totally incredible. Wouldn't that be something we'd have to find in order to agree with you? You could find that there are sufficient gaps throughout the entire case that there's not enough there to rely upon it. And for instance, we have here that she says she spends $20, and an estimated weight of .4 grams. But at the lab, this weighs 1.3 grams. So it's entirely possible that there's a mix-up of the drugs, especially because the testimony at trial was the street value for .2 grams of heroin is $30. If she's getting 1.3 grams, she's somehow got $180 of heroin for $20. That just doesn't add up. Well, that's a different story, though. Is that a sufficiency of the evidence argument? Yes, yes. That goes to the reliability and credibility of the State's evidence. The defendant, however, never raised an issue on the chain of custody problem involving the sample. Well, the defendant, he did not lodge a formal objection. So here you have a person who's arrested for a small amount of narcotic. He's facing a Class 2 felony for .4 grams. However, when he gets to trial, he's facing a Class 1 felony for 1.3 grams. Correct. Okay. Doesn't that raise a reasonable question in the mind of the attorney for the defendant? What happened to the custody of this sample from the time of arrest until the time of trial? You would think so. Yes. And in this particular case, the defense attorney did not raise the issue as to the chain of custody problem. No. But the defense counsel did not let the chain of custody go entirely unchallenged. Would you say that it would be an ineffective assistance of counsel under the particular facts of this case to object to the chain of custody? If I had been the trial attorney, I certainly would have objected, I think. But defense counsel did not leave this completely unchallenged. Defense counsel cross-examined about it. Defense counsel asked about whether Powell actually remembered testing these drugs at all and asked her, hey, doesn't the bag say .4 grams on it, but somehow you got 1.3 grams? The State didn't, despite these gaps, take the opportunity to close up any of that. The State entirely passed up on redirect, in fact. Has the defendant waived his right to raise ineffective assistance of counsel before this court? You haven't briefed him. We have not. We're not raising this as a freestanding, words-complete breakdown in the chain of custody. We're raising this as, taken with the other facts in this case, the difference in the value of the drugs, the difference in the fact that he doesn't have drugs or money on him when he's arrested, the fact that the surveillance officer, who normally you would expect to testify, I saw them exchange something, affirmatively says she doesn't see Mr. Malone do anything with his hands. All of those factors taken together are a series of flaws and gaps in the State's case. That is how we're raising the issue. I'd like to know your opinion as to whether or not we can raise and discuss the ineffective assistance of counsel claim in this matter before us now. In terms of chain of custody? Correct. Well, I would expect that, you know, I would certainly be happy to brief it for this court, but, you know, it's not currently in the briefs now. But I do think, had I been trial counsel, you know, I would have made a bigger deal of it, I think, because we do have some real concerns about the case. Okay. You've also briefed out a problem in the courts handling the Zayer instructions to the jury. Absolutely. Absolutely. And this is a case in which, as I'm sure Your Honor is aware, the Illinois Supreme Court requires strict compliance on the 431B Zayer compliance issue. And the judge here does not ask the potential jurors if they understand and accept that Malone doesn't have to present evidence, which is not the same thing as not being required to prove his innocence. Assuming I agree with you on that point, the fact that at trial, counsel for the defendant failed to object to the court's erroneous, alleged erroneous instructions on his Zayer, that would be a waiver, wouldn't it? Well, that would mean that this court could still review the issue as plain error. Yes. We've agreed that the error is otherwise forfeited. Okay. We have here a case in which this jury clearly struggled with the evidence before it. This is a case with three police officers, a chemist, and an employee of the Cook County State's Attorney's Office. It should be an open issue. I want to ask you, is it ineffective assistance of counsel for an attorney not to object to the court's erroneous Zayer instructions when he knew he had before him a case in which there was only one testifying officer against him? I'm not aware of having seen that in case law before. The only testifying officer is the arresting officer and the lab person. Well, we also have the by-officer, the surveillance officer, who doesn't see much of anything, and then we have the arresting officer and the chemist. Counsel, let me ask you. There are cases, People v. Chester and People v. Ingram, that kind of suggest strongly that you don't need to satisfy the Zayer, and they're specifically on point with the third prong of Zayer. Right. Word for word. How do you address those cases? Well, I think the reasoning in Walker is more persuasive. And in Walker, the judge told the jurors that the defendant didn't have to prove his innocence but did not ask about their understanding and acceptance of his right not to present evidence. But didn't the judge do this with the whole veneer at the beginning? Right. But that doesn't get into the jurors' understanding and acceptance of those principles. And I think there's a gap between presenting evidence and proving one's innocence. A jury could accept that he doesn't ultimately have to prove his innocence but could still think, well, we can hold the lack of affirmative evidence challenging the state's case against him. Or they could say we're free to draw unreasonable inferences against him because he hasn't presented evidence to suggest otherwise. So I think there is a gap between them, particularly because, you know, the preservation of innocence is the first principle in 431B. And so saying that he doesn't have to prove his innocence is really more duplicative of that, I think, than of the right to present evidence. Can I go back to the heroin for a minute? Absolutely. Counsel, again, it was 1.3 or 1.4 grams? 1.3. Okay. Which is more than a triple. And the testimony was and the stipulation was that there were two bags. Is that right? It was not a stipulation but, yes, two bags. Two bags. And the total amount in both bags was the 1.3 grams. Right. And the testimony of the chemist was there was a presence of heroin. Is that right? Right. That's what she says, that she did two tests, a color test, which is a preliminary test, and then the more advanced GCMS test, which is the presence of heroin. So do you know, are there any cases that talk about the proof that's needed as far as the presence of heroin or this is all heroin? Well, I think that gets to my commingling argument because I think the presence of heroin in a sample gets you, you know, to fulfill the statute. But here we have two bags that are mixed together and you get above 1.3 grams and then you have the test for heroin. So you don't know whether both bags contained heroin or whether just one of them did and one could be baking soda or a lookalike substance. It's not uncommon, I don't think, for drug dealers to cut their wares or to sell lookalike substances. You know, that's why it's also a crime to do that. So we have here, she says, you know, she puts both the items on the balance, removes the contents from the packaging, then places the bags on the balance to get the weight of the powder. She doesn't say she weighed the bags individually. She doesn't say she weighed one bag and then the other added them up. Right. And she repeatedly refers to the sample as a whole. So it could be that the one bag had, you know, certain presence and the other. Right, exactly. We don't know. And I don't know, I'm not a chemist, you know, how sensitive these tests are, but I think, you know, any amount in there is enough to get you heroin as a positive on the test. I have a question about the Chicago Police Department identification number that the chemist testified to. You made quite an argument in your brief about the difference in the inventory number that she testified to versus the difference that the police officer testified is the number. Can you expand on that a bit? I mean, the argument is that we don't know whether it was the same thing or not because they both testified to two different CPD inventory numbers. Right, right. And this is another of the flaws in the state's case because we have here CPDs testifying about inventory number 12939789. Powell gets on the stand. That inventory number is never mentioned. She's talking about case number C13025574, entirely different number. And she, you know, she's been with ISP, she says, for over 11 years. You'd think these things would be connected up somewhat, but they're not. And the purpose of the unique identifier is to help establish that chain of custody so that you know that what's recovered from the defendant is actually what's the same sample that's being tested. But here we have two different identifiers. We don't know based on her testimony, you know, that we can't be sure that it's the same sample. And while there's the stickers on the exhibit bag that's in my brief, we don't know when they're generated. We don't know when they're put on there. She does not say it's the only test she does that day, and it probably stands to reason that she's pretty busy. She's a chemist in the ISP forensic lab. Should we be concerned that the officer that made the arrest had over 20 years' experience in these type of narcotics arrests? And at the time that she made the arrest, she was of the opinion that this was a Class II felony case, charged him for .4 grams, but yet this officer of 20 years' experience, based upon what the lab tech says, misestimated the weight by almost a gram. Absolutely. I think so. And while she testifies that the .4 gram is an estimate that comes from ISP, I think at some point, you know, an estimate still has to have a basis in reality. And she's been there 20 years. She's done, she says, over 700 undercover operations like this. You would think you'd become pretty familiar with this looks like about half a gram, not over a gram. What about the alleged price for this narcotics? He paid $20 for two bags. Right. He was buying bags. He was selling bags. Right. He wasn't necessarily selling a guaranteed quantity. Right. That's true. But, you know, a dime bag, I think, generally is about $10, and it can be about a tenth of a gram. It's odd that if he's Could be as high as how much? That I'm not sure. But it's unusual to me, I think, that you have two bags where they would each be about .65 grams. That's a lot of drugs for $10. And that's part of what doesn't make a lot of sense here is that she's buying at least 60, if not $180 worth of heroin for $20. Like, that just So he was giving away heroin. Well, you know, the state made an argument in closing that, well, you know, he was a great businessman because he's got the drugs and the money in an alley, but he's clearly not. If he's selling $180 worth of heroin for $20, that's more than a fire sale. Given all of these facts, I can't understand how the defense attorney could fall down and not going forward with a chain of custody in the sample. It was crucial to his defense. And the failure to do so appears to me not a matter of strategy. I think it's a matter of inexperience. Well, I think, you know, counsel here made some of the chain of custody points in closing and maybe he thought that did the job. I believe it was a male and a woman, two attorneys. But, yeah, you would think that there would be more of an objection to this, and especially given how much the weight of the drugs. Considering how much time you spent arguing in your brief, I mean, I know that you are probably loathe to say anything negative about your colleagues, but that jumps out as an issue that you would really want to bring to the attention of the trial court immediately. It does. It does. And I would be happy to brief an ineffective assistant. No, I think trial, you know, when you were in the court below, the chain of custody issue seems to me that that required a lot more attention than it seemed to have gotten in the course of this trial in the trial court. And the state certainly could have closed it up on redirect and then instead the state just gave up any possibility of redirect and went on with the case. Counsel, you say the evidence is closely balanced? Yes, absolutely. And that's based on? The jury here clearly struggled. As I pointed out, we have a case in which there's no drugs or money found on the defendant immediately after his arrest, even though, you know, two minutes after the transaction, even though he's got his own money, so it's not like he just got rid of everything. We have this discrepancy in the weight, the fact that she's getting $180 worth of drugs for $20. And the jury here clearly struggled. They sent out several notes, deliberated over five hours, in a case where you've got three police officers, a chemist, and a Cook County State's Attorney's employee. This should have been an open and shut case. But this jury here also, you know, they struggle. They send out a note asking what reasonable doubt means. They have to say they can't reach a decision. They ultimately end up acquitting on delivery within 1,000 feet of a church, even though there's not really any dispute about the distance. This has all the hallmarks of a compromise verdict, a jury who has said, well, we'll acquit of the greater, we'll convict of the lesser, we just can't otherwise say that this is enough for the state. And I think given those facts, all of those facts put together, I don't see how this evidence could be anything less than closely balanced. And I think the jury's struggle really exemplifies that. Was it actually five hours they were out? They were out over five hours, yes. In a drug case like this, you would otherwise expect them to be pretty quick. But they really struggled with this verdict. And so any error this court finds on the Zaire issue or on the prosecutorial misconduct in which the state did not present any affirmative evidence that the alley was searched, but then assured the jurors don't worry about it, the drugs and the money are in the alley, either of those errors, if this court finds error, a new trial is the appropriate remand for Mr. Malone because of the closely balanced nature of this case. Unless this court has any other questions, I'll reserve my remaining time for rebuttal.  Thank you, counsel. Good morning again, Your Honors. Good morning, counsel. Harino Megani-Wakely for the people. The jury properly found defendant guilty of delivery in this case. The evidence, viewed in the light most favorable to the prosecution, showed that on June 27, 2013, Officer Grubbs was working undercover. She went to a location where defendant was on the sidewalk. Defendant proceeded to sell her heroin, which was subsequently weighed at 1.3 grams. And defendant was positively identified. Counsel, what about the testimony regarding the street value of the heroin that the officer testified to and the discrepancy in the amount of heroin that was actually found? I mean, 1.3 grams for $20? Respond to that, please. I mean, that's an issue that you really do need to address. Absolutely. And it was addressed at trial also based on the testimony of Officer Grubbs as well as Officer Johnson, who testified that it was an estimation. And what was put on the evidence bag was an estimation. Counsel, counsel. This officer had 20 years' experience. She's made over 700 buys of this kind. Her estimate was three times more or four times more than what it actually was. Doesn't that undercut the rest of her credibility if there's such a discrepancy in estimating the amount of drugs when she is experienced in doing this? What does that say about the rest of her credibility? Well, Your Honor, first I'd like to point out that based on my reading of the record, it wasn't Officer Grubbs who testified to the .04 grams. It was actually Officer Johnson, the inventory officer. And I have a record site, which is at H183 to 186. It was his testimony that he's the one who noted .04 grams on the evidence bag that he inventoried. And he specifically testified. There was a narcotics rate activity summary report that was brought up during the testimony of Officer Grubbs. And that report shows the estimated weight was .04 grams. And the State estimated the value of .04 grams of heroin at $60. Well, again, all of those, the weights were estimations by the on-scene officer as well as the inventory. My question is narrow and more specific, and that's what I'd like you to address your answer to. How do you respond to the credibility of an officer of 20 years' experience who has such a way? I mean, by any stretch of the imagination, that is a huge outlier in terms of her estimation. .4 is nothing like 1.3. I mean, how do you explain that, and what does that say about her credibility? Her credibility was based on the offense that occurred, which was that defendants said. Let me ask it in a different way. Is 1.3 grams close in volume to .4 or .3? I mean, obviously, based on the numerical equivalence, they're not. Unfortunately, I don't personally have any knowledge of what physically what they would look like different. So I'm sorry. I cannot tell you that. Well, 40 milligrams. 40 milligrams compared to 1.3. Again, and, Your Honor, you have to forgive me. I was not very good at math. Well, for example, we're not narcotics buyers. We're not narcotics buyers, obviously, okay? But let me say this. If I went to a car dealer and I said, I've got $20,000. I need a car. And the car dealer says, oh, okay, take that one over there. It's yours. Here's the key. And I drive out with a $180,000 Ferrari. Does that sound logical? It's, again, there. Because that's the direct ratio that we're talking about in this case. $20 buys 1.3 grams of heroin, which has a street value of $180 at least. And, again, there's no the prices are controlled by the seller of the drug. And he told Officer Grubbs that for two bags I need $20, and that's exactly what Officer Grubbs testified to. She didn't say I want a dime bag from you. Her testimony was clear. She pointed to a defendant when he walked over to her, pointed two fingers out, and he decided on his own to gather the drugs and said to her when he presented the two Ziploc bags that it was for $20. Now, based on her experience, yes, she believed that he would have given her, based on what he asked for, the dime bag or the .02 per bag. But what was ultimately found out by the chemist, who tested the same evidence that was given to Officer Grubbs, that it was 1.3. And so Officer Grubbs Now that we're talking about the chemist, let's get back to that. The chemist testified that she tested the drugs after she mixed them together. Does that make sense to you? Well, that's not an accurate or clear reading of her testimony. Her testimony Well, let me ask it another way. She said that both the two separate samples were mixed together and then it was tested for heroin. She did not test the bags individually before they were mixed. Can we agree on that? Absolutely not, Your Honor. Based on my reading She tested them individually before she mixed them together. Is that what you're saying? Her testimony, viewed in the light most favorable at this point, indicates that she testified regarding her weekly procedure of cleaning the weight scale. I'm just talking about this particular and, you know, sometimes when the answer is obvious, you have to concede it, even if it's not favorable to you. So I'm asking the question again. Isn't it true that her testimony was that she tested the substance after both bags had been mixed together? Yes or no? That's a yes or no question. No. The people's position is that's not how her testimony should be. Well, a half hour before we joined this hearing this morning, I read her testimony. And the question asked her, what's the first thing you did? And her answer was the first thing she did was she emptied out the two bags onto the scale and the scale measured 1.3 grams. She then went on to test that sample and found the presence of heroin. There's no dispute on that. The record is what it is. Well, and if there is, counsel, where in the record does it dispute what the justice just said? Well, she said her testimony, in my recall of the record, was that she conducted the color test for the class of drugs, and then she weighed the two packages, and then her opinion was that it was 1.3 grams of heroin. So she doesn't really say if she mixed them together or didn't. Exactly. And so there's no evidence in the testimony that she says that she commingled it or mixed it. But we don't know, right? But when you look at the entirety of her testimony, as well as the other evidence that was presented, including the actual physical evidence that's at issue here, which is People's Exhibit 1, and I would direct the Court's attention to her testimony of what she did after testing the drugs. And she said, and I'm quoting her, she placed them in the plastic bags. She heat-sealed them and replaced them in the Chicago Police Department-issued bag. Now, of course, the people's position is that her testimony, viewed in its entirety, shows that her use of them signified that she replaced more than one bag of item in the bag, People's Exhibit 1. And then I would ask the Court's attention to be directed to the police officer who testified to People's Exhibit 1. And Officer Grubbs, after the chemist had identified People's Exhibit 1 and said she resealed it, put back them, the two items, Officer Grubbs was shown People's Exhibit 1 at trial and asked to identify it. And she said, those are the drugs. That contains the two Ziploc bags that she got from the defendant. So, again, there was a consistency that the chemist put back two bags, and then Officer Grubbs, the person who originally got the two Ziploc bags, positively identified them as the two Ziploc bags in the same exhibit as the ones that she got from the defendant. And then there's more. Because then there's Officer Johnson, who testifies that he inventoried the items that's at issue, which was People's Exhibit 1. And he said, looking at People's Exhibit 1, the one that had been tested by the chemist and put back the two Ziploc bags, the ones that have been identified now by Officer Grubbs as the two Ziploc bags containing the white powder that she received from the defendant, he says, that's consistent with what was given to me by Officer Grubbs. I inventoried them, and it still has what I inventoried. And I wrote the inventory description on my bag, which was two, and I'm reading, two clear Ziploc bags, or Ziplocs, with green dollar signs, with one side each containing a white powder, suspect heroin. And what I would suggest to this court, and what I know the evidence shows, is that this testimony, the collaborative testimony of all of these officers, as well as the chemist, shows that there was no commingling, that the powders in the two bags were kept separate, and that that's what the evidence shows. And it is the people's position that that evidence, which at this stage should be viewed in the light most favorable, is consistent with the fact that the chemist did not commingle. Okay, but the chemist didn't say them. The chemist didn't say, I took one bag and I waited, I took the second bag. The chemist said them. You're talking about them, those bags, how many were there? Yes. Do we draw a reasonable inference from that, that she did them separately, or we're taking a leap of faith? No, first, of course, I would point out that in this stage, that her testimony should be viewed in the light most favorable to the prosecution. But in addition to that, there should not be a presumption of impropriety. And I would direct this quote of impropriety that occurred based on the vagueness of the record. I'm not suggesting there is. I'm suggesting maybe the state attorney that inquires should have gotten this testimony out a lot better than he or she did. And in hindsight, a lot of things could have been different. But the fact remains that the testimony that is at issue before this court does not show commingling. It does show that there was no commingling. And again, I would ask the court to review all of the evidence. And that should this court find that the record is in any manner unclear, that that vagueness or unclarity should not be held against the prosecution at this stage. With respect to the chain of custody, I did address it as I was referring to Officer Johnson's testimony and all that. But I do want to point out that this was absolutely a challenge to the chain of custody being waged by defendant on appeal for the first time. And it is forfeited. That this is an evidentiary issue. No objection was waged. And this forfeiture should not be salvaged under plain error review because there was no error in the first instance. The proper foundation was laid by the people below for the admission of People's Exhibit No. 1. Reasonable measures were taken that the drugs received from defendant were the same ones tested. All of the officers positively identified People's Exhibit No. 1. And there was clear testimony regarding the protective measures that were taken regarding the keeping of these drugs and how they were inventoried. Defendant is unable to show any evidence of tampering. I do direct this court's attention to what is appended to her brief as well as what's in the record before this court. And I would direct the court's attention to actually People's Exhibit 1, the photocopy of the front of the bag and the back of the bag. And that same exhibit had not only the inventory number that was testified to a child, but also the same state lab number. Counsel, we only have so much time. And I'd like to move over and have you address the problem with the Xer instructions. Absolutely. And just to conclude, for those reasons, the issues argued. Obviously, the jury had some problems with this case. It took them a considerable amount of time. And I don't want to underestimate the importance of our criminal circuit court to adhere to Rule 431b. They're required to ask each potential juror four questions. They're four very simple questions. And in this particular case, question number three appears to me was not properly presented to the jury as it appears in the rule. And the jurors were not given the option to accept or reject the principle that the defendant is not required to offer any evidence on his or her own behalf. The court, I believe, presented a fast and loose presentation. And your brief to show that the court properly addressed it, you quote the court saying, the defendant has no obligation to testify on his own behalf or to call witnesses in his defense. This is not number three. It kind of paraphrases the number fourth instruction. Well, if I may direct the court's attention to what the jury was told later. Quite frankly, I'm tired of seeing these Xer instruction cases coming up before the court, this court, four or five years after People v. Thompson, and the criminal court is still doing the same thing. Well, Judge, and with Thompson in mind, I would actually direct this court's attention to the holding of Thompson. Where in Thompson, the trial court said to the potential jurors with respect to the third Xer principle, that's the issue before this case. The second instruction involved. Yes, that the defendant is not required to prove his innocence. And the issue before the Thompson court was whether that was sufficient to satisfy principle number three. And the court did not say the wording used to convey that principle was wrong. What the court found in Thompson was that after that principle was conveyed to the jury, that the jurors were not given the opportunity to acknowledge or affirm on the record that they understood and accepted that principle. And in this case, consistent with Thompson, and again, the jury was specifically told the same language used in Thompson, which was that the defendant does not have to prove his innocence. But more importantly, consistent with what Thompson requires, the court said to the jurors, does everyone understand that? And then he indicated on the record, yes. Does everyone accept that? Again, everyone indicated yes. And so, Your Honor, to address your concerns, that concern did not occur in this case. It was complied with as consistently with Thompson. And we would ask that strict compliance be deemed. Based on the strict compliance, there was no error in the first instance, and forfeiture principles should be applied because there was no objection waged below. For the reasons stated here, as well as the reasons stated in our brief, the people respectfully ask that defendant's conviction and sentence for delivery of a controlled substance be affirmed. Thank you, Your Honors. Brief rebuttal. Just a few quick points, Your Honors. First of all, I want to clarify that the state points out that, the state represented that the chemist did the color test before wearing the bags, and that it actually is not accurate. At page I-16 in the record, she says that she does the color test after the balance, after she's got the bags on the balance, so the commingling of the substances occurred before any tests for the presence of heroin. I would also point out that the fact that Officers Grubb and Johnson ID'd the bags at trial doesn't speak at all to whether they were commingled, really, because they don't know what happened in the lab. And it also makes sense, if you get two bags as your sample, to put your samples back in there after the fact. And I think the chemist repeatedly refers to the sample in the plural, and I think the clearest inference from that is that she's got one sample of suspected drugs, not two. And then, with respect to the state's point that all of the officers and the chemist identified Exhibit 1, that doesn't really help us much, I think, because drugs are pretty fungible. That's why we have chain of custody and things like that. It's not like identifying a gun or a photo of a crime scene. It's, you know, two bags of drugs shown to you at a drug trial. I think that's a little different than, yes, that's a photo of my house, or something along those lines. And finally, with respect to the Zare issue, that the jury at the end of the case was told they couldn't hold defendants' failure to present evidence against him, that doesn't do anything for us for 431B, because the point is to make sure that the potential jurors understand when they're being selected, that understand and accept all of the principles. So after the fact, that doesn't do much for us. And I think that's it, unless this Court has any other questions. We would ask this Court to reverse Mr. Malone's conviction. Thank you. Thank you both for a very spirited argument. This matter will be taken under advisement. The Court stands adjourned.